UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                    :
UNITED STATES OF AMERICA,                           :
                                                    :        **CORRECTED MEMORANDUM**
            Plaintiff/Appellant/Cross-Appellee,  :        **DECISION AND ORDER**
                                                    :
            - against -                              :        11 Civ. 5608 (BMC)
                                                    :
EDWARD P. BOND, Liquidating Trustee of              :
the LIQUIDATING TRUST FOR PT-1                       :
COMMUNICATIONS, INC., PT-1 LONG                      :                **FILED**
DISTANCE, INC. AND PT-1                              :           IN CLERK'S OFFICE
TECHNOLOGIES, INC.                                   :        U S DISTRICT COURT E.D.N.Y.
                                                    :
            Defendant/Appellee/ Cross-Appellant.  :        ★ SEP 1 7 2012 ★
                                                    :
--------------------------------------------------------X        BROOKLYN OFFICE

**COGAN**, District Judge.

Before me is an appeal from a final order of the Bankruptcy Court for the Eastern District

of New York, which incorporated four interlocutory orders. The United States (hereinafter the

"IRS") challenges these interlocutory orders and the final order on eight separate grounds, most

of which have sub-arguments. The Liquidating Trustee ("the Trustee") appeals on one ground.

The final order of the Bankruptcy Court is hereby affirmed, substantially for the reasons set forth

in the four interlocutory orders and the denial of a motion for reconsideration filed by the Trustee

and issued subsequent to the final order, with one exception. I conclude that the Bankruptcy

Court was without jurisdiction to enjoin the IRS's future exercise of its rights to setoff and

recoupment. I write here to explain my reasoning for that conclusion, as well as to clarify my

reasons for affirmance on certain issues and to address issues not discussed in the Bankruptcy

Court's decisions.

## BACKGROUND

This case concerns the income tax treatment of three related telecommunications entities, PT-1 Communications, Inc., PT-1 Long Distance, Inc., and PT-1 Technologies, Inc. (hereinafter "PT-1" or the "PT-1 Entities"). In 2000, WorldCom engineered a hostile takeover of both PT-1 and its parent company, the Star Group, which culminated in PT-1 and the Star Group filing for bankruptcy in 2001. WorldCom itself filed for bankruptcy in 2002. During PT-1's decade-old bankruptcy proceedings, numerous disputes have arisen with regard to PT-1's tax treatment during this tumultuous period. These disputes have now been resolved by the Bankruptcy Court and are before this Court on appeal. Roughly $16 million plus a decade of interest is at stake, with the United States seeking to recover $7 million in postpetition taxes, and the Trustee seeking to recover alleged prepetition and postpetition overpayments totaling $8.8 million.

## I.  PT-1's Business

PT-1 principally performed two services, each of which allowed for phone calls to be completed through long-distance switches it either owned or had a right to use. First, it sold pre-paid calling cards. Second, it provided dial-around long distance, which allowed a telephone caller to avoid his default long-distance carrier by dialing a prefix, such as "10-10," prior to the ten-digit telephone number.

For a time, PT-1 was a successful and independent group of companies. In the mid-1990s, the three PT-1 Entities filed their own consolidated income tax returns, with their tax year ending June 30. The exception was an eight-month return that ended February 4, 1999, because on that date PT-1 was taken over through a merger with the Star Group, a larger group of telephone industry companies. For the 1998 tax year, PT-1 paid $6.2 million in corporate income tax, some portion of which the parties agree was an overpayment arising from the

2

carryback to this tax year of the net operating loss ("NOL") from PT-1's eight-month tax period ending February 28, 1999.

With Star's acquisition of PT-1 in 1999, PT-1 was included in the Star Group's consolidated income tax return for the periods ending December 31, 1999 (ten months) and December 31, 2000 (twelve months). Both returns report net operating losses, with the returns containing an allocation of losses to its constituent entities, including PT-1. However, a problem arose for the 2001 return. In late 2000, WorldCom had taken control of PT-1 pursuant to a stock pledge agreement with Star on which Star defaulted. Under WorldCom control, the PT-1 Entities then filed for bankruptcy in the Eastern District of New York on March 1, 2001, and later that year Star filed in the District of Delaware. However, for some undisclosed reason, neither WorldCom nor Star would include PT-1 on its consolidated return for any portion of the 2001 year. PT-1 was unaware of this fact for quite some time, due largely in part to Star's March 2002 request for an extension of time to file its return, which extension included PT-1.

## II.   PT-1's Tax Returns

The Star Group has not yet filed any type of return for any portion of 2001. The PT-1 Entities thus became self-described "tax orphans," with neither of their putative parents willing to include them on their consolidated income tax returns for the 2001 tax year or years going forward. Choosing then to file their own return, the PT-1 Entities in September 2002 filed a consolidated income tax return for the postpetition portion of 2001 (the "Short Period"), reporting tax due of $6,706,172 based on $19,160,492 in taxable income, which reflected $20,455,135 of taxable income before the application of an NOL carry-forward allocated to PT-1 from the Star Group 2000 return in the amount of $1,294,643. The Short Period return was not

3

accompanied by a request made under 11 U.S.C. § 505(b) for a prompt determination of tax.[1]

PT-1 paid that administrative tax expense of $6.7 million with the return in the ordinary course

of business as the debtor in possession. The Trustee has been attempting to recover this tax ever

since on the grounds that PT-1 in fact had no tax liability for the Short Period.

   PT-1 did not at that time file a return for the prepetition portion of 2001 – the period

referred to by the parties as the "Stub Period." It did, however, file an amended return for its tax

year ending June 30, 1998, seeking a refund of over $2 million as a result of NOL carrybacks

from the subsequent two tax periods. The IRS did not respond to this refund request until

January 27, 2004, stating that because PT-1 had not filed a tax return for the Stub Period, PT-1

might potentially have owed additional tax to the Government which could offset the refund

claim amount. PT-1 then sent to the IRS two unsigned returns; one purporting to address the tax

for the Stub Period, the other purporting to address the tax for the full 2001 calendar year. PT-1

also requested that the IRS deal with it on its own for the 2001 tax year because Star no longer

existed, which the IRS refused to do.

   For the 2002 tax year, PT-1 filed its own consolidated income tax return, which included

a request made under Section 505(b) for a prompt determination of tax. The 2002 return

included a bad-debt deduction of $21,648,496 and an NOL of $5,590, 832. The IRS examined

the 2002 return, and eventually disallowed all but around $900,000 of that claimed bad-debt

deduction, which converted that NOL to positive taxable income of around $14 million, with a

$5.1 million tax claimed by the IRS on that income. The IRS's examination was not completed

within the time allowed under Section 505(b). Instead, the IRS filed on August 1, 2006, a

---

[1] Section 505(b) provides that unless the IRS completes the examination within 180 days, the estate, the trustee, the debtor, and any successor to the debtor are discharged from any liability for additional tax later determined to be owed. See 11 U.S.C. § 505(b)(2). An amendment in 2005 added the "estate" to the scope of this discharge.

4

request for payment of administrative expense for the 2002 year in the sum of $7.8 million related to the disallowance of the bad-debt deduction.

For the 2003 tax year, PT-1 again filed its own consolidated income tax return and again included a request for a prompt determination of tax under Section 505(b). The IRS did not examine this return, and has never charged tax or filed a request for payment for the 2003 tax year. The 2003 return reported a loss of $4,062,803, which the Trustee has sought to carry back to the 2001 Short Period.

### III.   PT-1's Pre-Paid Business and its Sale

On PT-1's books, when a pre-paid calling card was sold, the proceeds of the sale were classified as deferred revenue and were not immediately recognized as income. PT-1 contended that it was not required to consider any payments as income (for tax purposes) until it rendered the service of completing the call under Generally Accepted Accounting Principles. Although the IRS disagrees, this dispute is not at issue here.

In February 2001, one month before declaring bankruptcy, PT-1 sold its pre-paid calling card business to a third party, IDT. At that time, its deferred revenue account contained $27.7 million in cash that had not yet been reported. The parties agree that as part of the sale, IDT purchased the assets of the phone card business, including inventory and all accounts receivable, and agreed to service the remaining calls for outstanding cards in circulation. However, how much the business was sold for is in dispute.

The face of the sale agreement identified a one-dollar price tag,[2] and Rosalind Gaffney, head of PT-1 tax, testified at trial to the same price. However, the agreement also required IDT

---

[2] Although the sale agreement, a subsequent adversary complaint file by PT-1 against IDT, and the settlement agreement resolving this complaint were not entered into evidence at trial, the IRS subsequently moved to reopen the record approximately 1 year after the evidentiary hearing had concluded and over four months after oral argument so that the Bankruptcy Court could take judicial notice of these documents. Although the Bankruptcy

to indemnify PT-1 for up to $5 million against certain then pending litigation claims.  Under the agreement, if those claims were not resolved within a 120-day period, IDT would give PT-1 cash equal to 70% of the indemnity obligations, or $3.5 million.  More importantly, IDT agreed to compensate PT-1 for PT-1 providing "termination services" for the cards already in circulation.  IDT agreed to deposit $4 million in escrow, which was to be paid to PT-1 upon closing as a "deposit" for these future obligations.

In March 2001, IDT and STAR amended the agreement with IDT, causing PT-1 to execute the amendment as well.  A significant change to the agreement was that IDT was no longer required to pay the indemnity or the $4 million deposit, which evidently had not been placed in escrow or paid to PT-1 upon closing of the sale as the original sales agreement had required.  According to the Trustee, PT-1 performed its post-sale obligations under the contract, but IDT never paid.

PT-1 initiated an adversary proceeding against IDT in its own bankruptcy on July 25, 2002.  The complaint includes claims for unpaid services rendered in excess of $10 million, the failure to pay the $5 million indemnity, and the failure to pay the escrow deposit.  Further, the complaint asserts a claim for fraudulent conveyance based on the allegation that Star caused PT-1's pre-paid calling card receivables (worth about $22 million) to be transferred to IDT in exchange for assuming service obligations that would cost a fraction of the value of the receivables, while IDT simultaneously agreed to pay $9 million to Star in exchange for stock that ended up being worthless as Star soon filed for bankruptcy.  The complaint also asserted that IDT and Star caused the $4 million payment that the contract required to be paid to PT-1 to be made to Star instead.

---

Court denied this motion, it discusses the contents of the documents in one of its decisions, as do the parties.  The parties further dispute the meaning of these documents.  I therefore discuss them in this Decision.

In 2004, prior to the confirmation of the plan, the debtor in possession and IDT settled and agreed that the debtor would receive IDT common stock to be sold in installments with a guaranteed value of $14.3 million. The proceeds of that settlement were made part of the assets of the Liquidating Trust. The income tax consequences of the sale of the pre-paid business are disputed in this case, but PT-1's accounting of the sale can be described as follows.

On PT-1's 2001 proposed Stub Period return (apparently filed in 2004), it reported approximately $5.9 million in income. This figure was derived from recognizing the $27.7 million in PT-1's deferred revenue account, then subtracting approximately $22 million for the account receivables and $665,000 for the inventory it had transferred to IDT. In addition, PT-1 purportedly received $1 in consideration from IDT for the sale. The difference is a net gain of $5.9 million. However, when netting this gain with a deduction of approximately $12 million for debt that was allegedly uncollectible, the Trustee reported a loss for the Stub Period of over $6 million.

## IV.    PT-1's Long Distance Business

PT-1's dial-around long distance business allowed long-distance callers to bypass their default long-distance carrier by using switches owned either by PT-1 or Star. A long distance caller who wanted to dial-around his default long distance provider would place a phone call using a prefix (usually "10-10"), the call would be routed to a PT-1 switch, and PT-1 would complete the call from that point forward, collecting data from its switches for billing. The PT-1 switch would collect from the dialer the local phone number from which the call was being made, the date and time of call, the duration of the call, and information about the local-exchange carrier that transmitted the call from the caller's telephone to the PT-1 switch.

7

PT-1 booked income using this raw information from its switches immediately upon placement of the calls. Then, because it knew nothing more than the phone number of its customers, it relied on a third-party billing intermediary to attempt to collect the PT-1 charges from the local carriers that had contracts with the callers. Each local carrier, in turn, would attempt to collect the charges for the calls by including charges on the bills that they sent to their customers.

PT-1 was paid by the billing intermediary through a two-step "true-up" process. After calls that were too short to be billed were removed, the remaining calls were deemed accepted for billing by the billing intermediary, which provided the local-exchange carriers with the billing information. The local-exchange carriers would provide an upfront payment back to the billing intermediary, which would remit that payment to PT-1, taking out a percentage for commission. In making this upfront payment, each local-exchange carrier held back a portion of the money claimed in a reserve to protect itself from turning over to the billing intermediary more than what the local-exchange carrier could be expected to collect from the callers. Periodically, the billing intermediary would conduct a reconciliation process with each local-exchange carrier. This included so called "chargebacks," which meant that the local-exchange carrier had charged that call back to the billing intermediary if it learned that a call could not be completed or if a phone number was not correct. A second, final payment made to PT-1 reflected this true-up process. A document prepared by PT-1's accounting department provided evidence of the results of the true-up process through the end of 2002 and was introduced into evidence by the IRS over the Trustee's objection at an evidentiary hearing held by the Bankruptcy Court in July and August 2009.

8

Because PT-1 reported income that it ended up not receiving at the end of the true-up process, it would claim on its tax returns bad-debt deductions. The Government concedes that this is appropriate, but challenges the substantiation that the Trustee has offered for these deductions.

## V. Proofs of Claim, Requests for Payment of Administrative Expenses, and "Counterclaims" by the Trustee

On February 4, 2004 (one week after disallowing PT-1's refund request for overpaid taxes from 1998), the IRS filed its first prepetition proof of claim and postpetition request for administrative tax expenses that are relevant to the disputes at issue here. The claims were for approximately $35 million and consisted of a demand for taxes, penalties, and interest for the two-month prepetition Stub Period, penalties and interest for the postpetition Short Period, and penalties and interest for 2002 (also clearly postpetition).

On August 10, 2004, the IRS amended the February 4, 2004, claim, withdrawing its claim for prepetition Stub Period taxes. The amended proof of claim still contained a request for administrative expenses for Short Period penalties of $1,628,582.11 and interest on the penalties of $436,277.97.

On March 14, 2005, the Trustee filed a motion to disallow the IRS's requests for administrative expense payments. The Trustee also sought a declaration that PT-1 was permitted to file a tax return for PT-1 and its subsidiaries for the Stub Period. Additionally, the Trustee sought to carry forward and carry back NOLs against the taxable income for the Short Period; to recover a tax refund of $2,178,891 for the tax period that ended June 30, 1998 plus interest; and to recover a refund of the $6,913,228.53 paid with the Short Period tax return. PT-1 had previously requested a tax refund from the IRS for the 1998 tax year, but had not requested a refund for the Short Period at the time it filed this motion. It did, however, file what it called a

9

"protective" refund with the IRS in September 2005, which it attached to its second motion for summary judgment, filed in September 2007.

On March 17, 2005, the IRS filed another request, this time seeking unpaid taxes from the Short Period in the amount of $453,125 in addition to penalties and interest totaling approximately $200,000. This claim was filed after plan confirmation and appointment of the Trustee.

Finally, by request for administrative expenses filed August 1, 2006, the IRS dropped its demand for penalties with respect to the alleged Short Period tax, but added a new penalty request of $260,207.25 and interest on the penalty of $209,789.29. The IRS also requested $7.8 million in tax, interest on tax, and penalties based on its disallowance of all but $900,000 of PT-1's $21 million bad-debt deduction for the 2002 tax period.

## VI.    Bankruptcy Court Decisions

The Bankruptcy Court issued four decisions, a final order, and an order denying the Trustee's motion for partial reconsideration.

### 1)  Decision I: 357 B.R. 217, issued December 7, 2006

In Decision I, the Bankruptcy Court expunged the IRS proof of claim, as amended, which sought payment of administrative taxes of $ 7.8 million for the 2002 tax year. The Bankruptcy Court held that the debtor had made a proper request for an expedited determination of tax liability for that year pursuant to Bankruptcy Code § 505(b)(2), and because the IRS did not act timely to examine the return, the debtor and the Liquidating Trust were discharged of all tax liabilities not reflected on the 2002 return.

### 2) Decision II: 386 B.R. 402, issued March 26, 2007

In Decision II, the Bankruptcy Court disallowed the IRS's administrative claim for three

kinds of penalties related to $6.7 million in tax reported and paid for the 2001 Short Period.

Regarding that portion of the IRS's February 4, 2004 claim, as amended on August 30, 2004,

which sought penalties and interest based upon the debtor's purported failure to timely file the

Short Period return, the Bankruptcy Court noted that the IRS had withdrawn this claim.

Regarding the IRS's August 1, 2006, request for penalties for the Debtors' alleged failure to pay

estimated taxes for the Short Period, the Bankruptcy Court held these to be time-barred given

their filing after the administrative bar date.

### 3) Decision III: 403 B.R. 250, issued March 31, 2009

Decision III granted the Trustee's request for summary judgment on one of his two

"counterclaims" for a refund of $2,178,891 for taxes paid for the tax year ending on June 30,

1998. It also expunged that portion of the IRS's requests that sought taxes and interest for the

Short Period, and which had not been expunged in Decision II.

In so holding, the Bankruptcy Court made the following rulings: (a) it disallowed the

IRS's administrative tax claim for the 2001 Short Period on the grounds that the IRS's request

for payment under § 503(b) was not filed by the administrative claims bar date; (b) it rejected the

IRS's arguments that sovereign immunity barred the refund suit; (c) it ruled that filing a claim

for refund with the IRS was not required where the refund claim is a counterclaim to a proof of

claim filed in a bankruptcy case and the claims arose from the same transaction; (d) it rejected

the IRS's contention that the Tax Anti-Injunction Act barred it from directing the IRS to accept

an income tax return for the 2001 Stub Period that addressed the income and expense items only

of the PT-1 Entities; (e) it ruled that the APA allowed it to order the IRS to accept a

11

deconsolidated income tax return of PT-1 for the 2001 Stub Period; (f) it held that the IRS's
failure to object to the anti-setoff and anti-recoupment provisions of the plan prior to
confirmation bound it to the injunction in the confirmation order; (g) it granted the Liquidating
Trustee's refund claim for 1998 in the amount of $2,178,891 based on a carryback of PT-1's
allocable portion of the Star Group loss in 1999; and (h) it ruled that an evidentiary hearing was
needed to determine PT-1's NOLs from the other years without which the Trustee would not be
entitled to its claimed refund for the 2001 Short Period.

   4) **Decision IV: 447 B.R. 115, issued March 3, 2011**

   The Bankruptcy Court issued Decision IV on March 3, 2011, following a three-day
evidentiary hearing and two rounds of post-trial briefs and oral arguments. The Bankruptcy
Court held that: a) an undisputed NOL allocable to the PT-1 Entities from the Star Group's 2000
income tax return (in the amount of $7,423,328.00) could be applied toward taxable income of
the PT-1 Entities for the postpetition portion of the 2001 year, after passing through the 2001
Stub Period; (b) it held that the approximately $27.7 million in deferred revenue had to be
recognized upon the sale of PT-1's pre-paid calling card business as argued by the IRS, but held
this was offset by an approximately $22 million loss on that sale; (c) it sustained a deduction
reported on PT-1's proffered return for the 2001 Stub Period in the amount of $11,868,413 that
allegedly related to bad debts written off in connection with the same sale of the pre-paid phone-
card business; (d) it denied the IRS's motion to reopen the evidentiary record to take judicial
notice of PT-1's adversary complaint against IDT and the settlement agreement; (e) it allowed
deductions related to operational long-distance bad debt of $3,892,212.42 for the 2001 Stub
Period, $10,656,606 for the 2001 Short Period, and $8,133,202.04 for the 2002 tax year; (f) it
denied claimed long-distance bad-debt deductions in the amounts of $2,353,526 for the 2001

12

Stub Period, $12,467,028 for the 2002 tax year, and the entire $5,470,721 reported for the 2003 tax year.

### 5) Final Order, issued April 29, 2011

The final order specified the particular relief appropriate under the four prior decisions and provided for: (a) the recovery of an overpayment of $2,178,891 for the 1998 year (based on a loss carried back from 1999); (b) the recovery of an overpayment of $3,806,512 for the 2001 Short Period (based on losses carried forward from 2000 and the 2001 Stub Period); and (c) an injunction directing the IRS to accept a deconsolidated income tax return reporting the income tax liability of the PT-1 Entities for the 2001 Stub Period.  It also disallowed the IRS's administrative tax claims and enjoined the Government from exercising any setoff or recoupment rights.

### 6) Motion for Reconsideration Denial, issued September 28, 2011

The Trustee moved for reconsideration of the disallowance of an approximately $5.5 million bad-debt deduction from its 2003 tax year on the ground that it did not have sufficient notice from the joint pretrial order that this would be at issue during the trial, and that the Bankruptcy Court failed to apply the appropriate burden-shifting standard on disputes over deductions.  The Court denied the motion, explaining in detail why the Trustee had sufficient notice and why the Trustee had failed to sustain its burden on the deductions.

## DISCUSSION

As noted above, the IRS challenges eight rulings by the Bankruptcy Court on appeal, and the Liquidating Trustee challenges one ruling.  For three of the IRS's challenges and the one ruling appealed by the Trustee, I affirm the holdings of the Bankruptcy Court for the reasons stated in the respective decision.  For the remaining challenges, I write to explain my agreement and disagreement with the Bankruptcy Court's orders, and address those issues not before it.

I.     **Standard of Review**

A threshold issue disputed by the parties concerns the standard of review this Court must apply in evaluating the Bankruptcy Court's determinations. The tax disputes at issue here consist of claims against the estate, and, as explained in greater detail below, counterclaims by the Trustee on behalf of the estate. Accordingly, the matters before the Bankruptcy Court are core proceedings under 28 U.S.C. § 157(b).

As a core proceeding, questions of law are ordinarily reviewed *de novo*, findings of fact will not be set aside unless clearly erroneous, and discretionary matters, such as the denial of a motion to reopen the evidentiary record, are reviewed for abuse of discretion. See Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros., LLP), 673 F.3d 180, 186 (2d Cir. 2012); Bell v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006); Mendelsohn v. Port Auth. Trans-Hudson Corp., No. 11-cv-03820, 2012 U.S. Dist. LEXIS 110276, at *14 (E.D.N.Y. Aug. 3, 2012). Nevertheless, the IRS contends that as a result of the Supreme Court's holding in Stern v. Marshall, 131 S. Ct. 2594 (2011), even if the proceeding is core, this Court must review all aspects of the Bankruptcy Court's decisions *de novo*.

The issue before the Supreme Court in Stern was whether the bankruptcy court could constitutionally enter a final order on a counterclaim based upon a common law cause of action. The Supreme Court recognized that Congress granted that right to bankruptcy courts when it enacted 28 U.S.C. § 157(b), and that the subsections of this statute provide that a bankruptcy court may hear and determine 16 different types of matters, including counterclaims "by the estate against persons filing claims against the estate." Stern, 131 S. Ct. at 2603. The Supreme Court held, however, that with respect to common law counterclaims, Congress could not

constitutionally grant a non-Article III court the authority to exercise the judicial authority of the United States through entry of final orders. Id. at 2609, 2611, 2614-15.

The Trustee contends first that Stern should be read to only apply to common law causes of action, and that because its refund claims here are not, Stern does not require *de novo* review by this Court. I need not address whether this narrow reading of Stern passes muster, however, as the Trustee's second argument – that its refund claims fall under the public rights doctrine and therefore can be finally adjudicated by an Article I court – is clearly correct. In Stern, the Supreme Court recognized the long history of the public rights doctrine in federal jurisprudence, which dates back to Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 18 How. 272, 15 L. Ed. 372 (1856). Although the public rights doctrine has not been well-defined or treated consistently throughout history, see Stern, 131 S. Ct. at 2611, Northern Pipeline Constr. Co. v. Marathon Pipeline Co., 458 U.S. 50, 69, 102 S. Ct. 2858 (1982), the doctrine can nonetheless be described as follows.

Matters involving public rights are those which are susceptible of judicial power but which Congress may or may not place within the purview of Article III courts. See Stern, 131 S. Ct. at 2612. This doctrine is in part explained by principles of sovereign immunity, and in part based on the recognition that certain matters have been historically reserved to the political branches of Government. Thus, for the most part, the public rights doctrine extends only to matters arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments," Crowell v. Benson, 285 U.S. 22, 50, 52 S. Ct. 285 (1932), and only to matters that historically could have been determined exclusively by those departments, see Ex parte Bakelite Corp., 279 U.S. 438, 458, 49 S. Ct. 411 (1929). The logic of these decisions is that the Framers expected

15

that Congress would be free to commit such matters completely to non-judicial executive or legislative determination, "and that as a result there can be no constitutional objection to Congress' employing the less drastic expedient of committing their determination to a legislative court or an administrative agency." Northern Pipeline, 458 U.S. at 68, 102 S. Ct. 2858.

Applying this framework to the instant action, several factors establish that these tax disputes fall under the public rights doctrine. First, the Trustee's refund suit against the IRS fits squarely within the definition of a public right set forth in Crowell and reaffirmed in Stern. That is, the suit is between the United States Government and a party subject to the Government's authority, and it concerns the performance of the constitutional functions of the executive branch, *i.e.*, tax collection. Moreover, this action was only possible as a result of the Government's waiver of sovereign immunity under 11 U.S.C. § 106. It is not surprising, therefore, that a leading constitutional scholar has referenced Article I Tax Courts as deriving their legitimacy from the public rights doctrine.[3]

This conclusion is also consistent with the Framers' original understanding of the public rights doctrine as it applies to tax matters. Since the founding of our nation and up until the Civil War, the Federal Government relied primarily on customs duties to finance its activities rather than a national taxation system.[4] In the very first Congress, controversies surrounding customs duties were excluded from Article III Courts and instead placed under the purview of the Treasury Department. See Richard H. Fallon, Jr., Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 915 (Mar. 1998). Thus, the Framers' intent and

---

[3] See Erwin Chemerinsky, Formalism Without a Foundation: Stern v. Marshall, Univ. Of Cal. Irvine School of Law Legal Studies Research Paper Series No. 2011-51 (Nov. 27, 2011, forthcoming in Supreme Court Review), available at papers.ssrn.com/sol3/papers.cfm?abstract_id=1965604.

[4] See Executive Office of the President of the United States, The Budget for Fiscal Year 2012, Historical Tables, available at www.whitehouse.gov/sites/default/files/omb/budget/fy2012/assets/hist.pdf.

original understanding of Article III was that disputes regarding revenue collection by the

Federal Government could be committed to non-judicial resolution.

The Supreme Court has agreed.  One of the original decisions to address public rights,

Crowell, "attempted to catalogue some of the matters" that fall within the doctrine.  Northern

Pipeline, 458 U.S. at 70 n. 22, 102 S. Ct. 2858.  Among the various examples cited by the Court

in Crowell are "administrative agencies created for the determination of such matters" as

interstate and foreign commerce, immigration, and taxation.  See Crowell, 285 U.S. at 51, 52 S.

Ct. 285.  Thus, since 1932, the Supreme Court has recognized disputes over taxation as

concerning public rights.

Finally, I note that tax disputes have already been committed to the jurisdiction of the

United States Tax Court and the Federal Court of Claims which, like the Bankruptcy Court, are

Article I tribunals.  The decisions of these courts are reviewed under ordinary appellate

standards, i.e., legal determinations are reviewed de novo, but factual findings are reviewed for

clear error.  See Robinson Knife Mfg. Co. v. Comm'r, 600 F.3d 121, 124 (2d Cir. 2010) (noting

standard of review regarding Tax Court); Okerlund v. United States, 365 F.3d 1044, 1049 (Fed.

Cir. 2004) (same regarding Federal Court of Claims).  The Trustee contends that this establishes

that tax disputes fall under the public rights doctrine, while the IRS responds that a taxpayer's

option to file a refund request in an Article III court suggests the opposite.  Although I find that

the jurisdiction of Article I Courts over tax disputes is not dispositive of the issue as it does not

completely remove tax disputes from Article III tribunals, the Trustee nevertheless has the better

argument here.

In the division of authority between Article I courts on the one hand and Article III

district courts on the other, the key distinction as it applies to this case is that the choice of forum

17

belongs to the taxpayer, not the IRS.  A taxpayer may pay the tax allegedly owed and sue for a refund in either a district court or the Federal Court of Claims, see 28 U.S.C. § 1346, or it may bring the action in Tax Court before paying the tax, see Samuels, Kramer & Co. v. Comm'r, 930 F.2d 975, 979 (2d Cir. 1991).  In either case, the IRS has no constitutional right to adjudication by an Article III court, other than on appeal.  This provides strong support for the conclusion that because the Trustee elected to file its refund claim in the Bankruptcy Court, that Court's final decisions are constitutional, and are to be reviewed under the usual appellate standards.

Accordingly, I will review questions of law de novo, findings of fact for clear error, and discretionary matters for an abuse of discretion.

## II.   Sovereign Immunity and Jurisdiction Over Tax Refund Claims

"In any suit in which the United States is a defendant, there must be a cause of action, subject matter jurisdiction, and a waiver of sovereign immunity." Presidential Gardens Assocs. V. U.S. ex. rel. Sec'y of Hous. & Urban Dev., 175 F.3d 132, 139 (2d Cir. 1999).  The sovereign immunity of the United States may only be waived by statute, see id., and must be "unequivocally expressed." Diaz v. United States, 517 F.3d 608, 611 (2d Cir. 2008).  Section 106 of Title 11 is just such a statute, expressly abrogating sovereign immunity both with respect to proceedings under various provisions of the Bankruptcy Code, see id. at § 106(a), and for claims that are property of the estate and arise out of the same transaction or occurrence as a proof of claim filed by a Governmental unit in the bankruptcy proceeding, see id. at § 106(b). The Bankruptcy Court relied on each of these subsections in concluding that the IRS had waived sovereign immunity with regard to tax claims filed by the Trustee.  For the reasons stated below, I agree with the Bankruptcy Court that Section 106(a) applies in this case.  However, I do not agree that Section 106(b) applies.

18

### 1) Section 106(a)

The Bankruptcy Court held that the IRS waived sovereign immunity under Section 106(a) by concluding that the tax disputes at issue before it fell under 11 U.S.C. § 505, a statute specifically designated in subsection (a) of Section 106.  Section 505(a) empowers bankruptcy courts to resolve disputes with taxing authorities.  The IRS contends that this decision was error because 11 U.S.C. § 505(a)(2) limits the application of Section 505(a) to tax refund claims brought by a "bankruptcy trustee" on behalf of a "bankruptcy estate" after a properly filed refund request.  However, according to the IRS, the liquidating trust is not a bankruptcy estate, the Trustee is not a bankruptcy trustee, and the Trustee failed to properly file a refund request.  I am not persuaded by these arguments.

### a.  Brought on behalf of a bankruptcy estate

As an initial matter, I do not accept the IRS's contention that the tax refund claims at issue here are not property of the estate because the estate necessarily ceased to exist upon confirmation of the plan.  Section 1141 of Title 11 and the cases cited by the IRS in support of this argument undoubtedly stand for the proposition that a bankruptcy estate ordinarily terminates upon plan confirmation.  However, Section 1141 also explicitly states that this is the general rule "except as otherwise provided in the plan."  See 11 U.S.C. § 1141(b); see also Hillis Motors, Inc. v. Haw. Auto Dealers' Ass'n, 997 F.2d 581, 587 (9th Cir. 1993).  Pursuant to 11 U.S.C. § 1123(b), the plan at issue here specifically provided that the claims belonging to the debtor would be transferred to the liquidating trust to be asserted by the Trustee.  Further, the Trustee is charged with asserting claims solely on behalf of the unsecured creditors of the debtor, and was forced to defend claims by the IRS for tax obligations allegedly incurred by the debtor in possession after PT-1 filed for bankruptcy.  I therefore conclude, as numerous courts have,

19

that the Trustee represents the remainder of the estate in this claims process. See, e.g., Gordon Sel-Way, Inc. v. United States, 270 F.3d 280, 286 (6th Cir. 2001) (although relying in part on logic enumerated in a Chapter 13 case, holding that "where the debtor does not obtain a discharge and post-confirmation property is committed to the plan of reorganization, it would be arbitrary to exclude [post-confirmation] property from the property of the estate"); Guttman v. Martin (In re Railworks Corp.), 325 B.R. 709, 719 (Bankr. D. Md. 2005) (recognizing that "although normally the estate would terminate after confirmation, 11 U.S.C. § 1123(b)(3) expressly allows the estate to exist with respect to those claims that are preserved by the plan, and the vestige of the estate exists in the representative, who takes on a capacity similar to that of a trustee."); Schroeder v. United States (In re Van Dyke), 275 B.R. 854, 859 (Bankr. C.D. Ill. 2002) (holding that the liquidating agent's tax claims are brought on behalf of the estate because any recovery he makes will inure to the benefit of the debtor's unsecured creditors under the confirmed plan). Accordingly, the Trustee's refund claims are brought on behalf of the estate.

### b. Brought by a bankruptcy trustee

The IRS next argues that any and all refund claims brought in a bankruptcy court must be brought by a bankruptcy trustee (or a debtor in possession). However, Section 505 is not by its own terms expressly limited to such actions. Rather, the jurisdictional grant of that Section uses broad language, stating that "the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." 11 U.S.C. § 505(a)(1). Section 505(a)(2), in turn, provides various limitations to this broad scope, including the limitation set forth in subsection (a)(2)(B), on which the IRS relies. However, this limitation, which prevents a bankruptcy court from

20

determining the right of the estate to a tax refund before the earlier of 120 days after the "trustee"

requests such a refund or a determination is made regarding such request, is in essence a timing

and exhaustion of remedies provision.  See IRS v. Luongo, 259 F.3d 323, 330 (5th Cir. 2001)

(noting that the purpose of subsection (a)(2)(B) was to "prevent a refund claim from languishing

in the administrative process"); see also 11 U.S.C. 505(a)(2)(B) (prefacing that subsection by

stating that a bankruptcy court may not determine "any right of the estate to a tax refund, before

the earlier of . . .") (emphasis added).  It does not limit the bankruptcy court's ability to

adjudicate tax disputes to only those brought by bankruptcy trustees.

     If Congress had wanted to limit the right to bring refund claims in bankruptcy court

solely to bankruptcy trustees, it could have, and would have, done so expressly.  It did just that in

the same section of Title 11, stating in Section 505(b)(2) that "[a] trustee may request a

determination of any unpaid liability of the estate or for any tax incurred during the

administration of the case" by following a particular procedure.  The absence of such language in

Section 505(a)(2)(B) is telling, and distinguishes this case from Hartford Underwriters Ins. Co. v.

Union Planters Bank, N.A., 530 U.S. 1, 120 S. Ct. 1942 (2000), on which the IRS also relies.

     This conclusion is further supported by the legislative history of Section 505, which

provides a strong indication that it was not intended to be limited to refund requests brought

solely by bankruptcy trustees.  As an initial matter, Representative Don Edwards of California[5]

emphasized the broad scope of Section 505, stating that it "authorizes the bankruptcy court to

rule on the merits of any tax claim involving an unpaid tax, fine, or penalty relating to a tax, or

any addition to a tax, of the debtor or the estate."  See 124 Cong. Rec. H 11110 (daily ed. Sept.

---

[5] The Supreme Court has explicitly relied on the comments of Representative Edwards "as persuasive evidence of congressional intent" with regard to the Bankruptcy Reform Act of 1978, in light of the key role played by Edwards and the lack of a conference.  See Begier v. IRS, 496 U.S. 53, 64 n.5, 110 S. Ct. 2258 (1990).

21

28, 1978) (remarks of Rep. Edwards introducing the House amendments), reprinted in 1978 U.S.C.C.A.N. 5787, 6436, 6490.  Although this statement expressly refers to unpaid taxes, it establishes that Congress's concern when enacting Section 505 was to enable bankruptcy courts to resolve tax disputes of the "debtor or the estate."  As noted above, the refund claims brought by the Trustee here are for the benefit of the estate.

Second, although Representative Edwards's brief discussion of refund claims under Section 505(a)(2)(B) refers to claims brought by a "trustee," nothing in his statements indicate that the use of that term had any significance other than to express the general expectation, just noted, that the refund claim would benefit the estate.  See Luongo, 259 F.3d at 343 (Garza, J. dissenting) (quoting Representative Edwards's comments on Section 505(a)(2)(B) and concluding that the use of the term "trustee" indicates that refund claims were intended to benefit the estate).  Instead, his statements make clear that the focus and purpose when enacting Section 505(a)(2)(B) was to ensure that, in ordinary circumstances, a tax refund claim was filed with the IRS prior to the filing of a tax refund claim in the bankruptcy court.  I therefore conclude that the legislative history of Section 505 undermines any argument that the use of the word trustee in Section 505(a)(2)(B) was intended to limit tax refund claims to those commenced by such a party.

Finally, I find support for this conclusion in the fact that every decision cited by the parties that addresses the restrictive interpretation of Section 505 offered by the IRS here has rejected that position.  See Luongo, 259 F.3d at 328-29; Gordon, 270 F.3d at 284-85; Van Dyke, 275 B.R. at 858-59.  Notwithstanding the IRS's attempt to distinguish these cases on their facts or to criticize their reasoning, the uniformity of interpretation of Section 505 confirms that the tax refund claims brought by the Trustee fall under Section 505.

### c. After a properly filed refund request

Finally, the IRS contends that the Trustee failed to comply with Section 505(a)(2)(B) by not properly filing a refund request with the IRS prior to filing its claims in the Bankruptcy Court. Courts have uniformly recognized that the use of the phrase "properly filed" in that subsection incorporates 26 U.S.C. § 7422(a). See, e.g., United States v. Kearns, 177 F.3d 706, 710 (8th Cir. 1999); In re Rodriguez, 387 B.R. 76, 89 (Bankr. E.D.N.Y. 1998); In re Dunhill Medical, Inc., No. 92-37700, 1996 Bankr. LEXIS 435, at *13 (Bankr. D.N.J. Mar. 27, 1996). 26 U.S.C. § 7422(a) provides:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

The parties agree that the Trustee failed to file this request prior to filing its refund claim. Instead, in September 2005, approximately six months after filings its refund claim in the Bankruptcy Court, the Trustee filed with the IRS what it termed a "protective" refund claim for the 2001 Short Period. The Trustee attached this refund request to its second motion for summary judgment filed with the Bankruptcy Court in September 2007. According to the IRS, the Trustee's failure to exhaust administrative remedies prior to filing suit deprived the Bankruptcy Court of jurisdiction to hear the Trustee's Short Period refund claim.[6]

In response to this argument, the Bankruptcy Court relied on a line of cases holding that the requirement that a party first file a refund request with the IRS does not apply when the refund suit is filed in the bankruptcy court as a counterclaim. See In re PT-1, 403 B.R. 250, 263 (Bankr. E.D.N.Y. 2009) (citing Kearns, 177 F.3d at 711; In re Rodriguez, 387 B.R. at 89; United

---

[6] PT-1 had already filed a refund request for 1998, thus removing that claim from this objection by the IRS.

23

States v. Henderson (In re Guardian Trust Co.), 260 B.R. 404, 414 (S.D. Miss. 2000); In re

Dunhill, 1996 Bankr. LEXIS 435, at *13-14).  These decisions in turn rely on the statement of

Representative Edwards that "if the refund results from an offset or counterclaim . . . the trustee

would not first have to file and administrative claim for a refund with the tax authority," as well

as general concerns of efficiency and practicality.  See, e.g., Kearns, 177 F.3d at 711; In re

Rodriguez, 387 B.R. at 89.  However, statutory interpretation both begins and ends with the

statute's language when that language is clear, unless such an interpretation would lead to an

absurd result.  See Lamie v. United States Tr., 540 U.S. 526, 534, 124 S. Ct. 1023 (2004);

Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146 (1992); ASM

Capital, LP v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), 582 F.3d 422, 427 (2d

Cir. 2009).  In this case, Section 505(a)(2)(B) unequivocally states that bankruptcy courts may

not determine the right of the estate to a tax refund until after the trustee "properly requests such

refund." This language requires exactly what it says – that the trustee files a proper request for a

refund with the IRS before a bankruptcy court may determine the right to a refund.  Further, the

purpose of this provision is undoubtedly to ensure that the IRS has the opportunity to consider

refund claims before having to litigate them in court.  Although, in the case of counterclaims,

such a requirement is arguably inefficient, it is by no means absurd.

Accordingly, I cannot consider Representative Edwards's statements regarding a

potential exception to the exhaustion of remedies requirements found in Sections 505(a)(2)(B)

and 7422(a).  Courts must presume that a statute says what it means and means what it says.  See

BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183, 124 S. Ct. 1587 (2004).  If Congress

truly intended there to be such an exception, it would have included it in the statute.  The Trustee

therefore was required to exhaust administrative remedies in this case.  See Graham v. United

States (In re Graham), 981 F.2d 1135, 1138 (10th Cir. 1992) (analyzing Sections 505(a)(2)(B) and 7422(a) and concluding "[s]imply put, no claim, no refund").

In light of the Trustee's failure to exhaust, The IRS contends that the Trustee's only remedy is to bring an original action against the IRS in this Court, which may or may not be barred by the statute of limitations. In support, it cites Strategic Hous. Fin. Corp. of Travis Cnty. v. United States, 86 Fed. Cl. 518 (2009), which held that federal courts are without jurisdiction to hear refund suits when a taxpayer failed to exhaust administrative remedies prior to filing suit. See id. at 548 n.55. In the alternative, the IRS suggests that this Court consider the late-filed refund request as a supplement or amendment to the original filing. For the following reasons, I conclude that the Trustee's failure to file a request with the IRS prior to filing its claim is not an absolute jurisdictional bar. Additionally, I find that the Trustee's filing of its request with the Bankruptcy Court in 2007 amounted to an amendment of, or supplement to, its initial pleading, and that the Trustee's filing of its refund claim with the IRS was sufficient to exhaust administrative remedies.

As an initial matter, Section 505(a)(2) provides that a bankruptcy court "may not so determine" the right of an estate to a tax refund before the trustee properly files a refund request. Section 7422(a), in turn, provides that no suit or proceeding shall be "maintained" without first filing such a request. The use of the phrases "determine" and "maintained" is important here, as it indicates that a dispute may not be decided and the proceeding shall not be allowed to continue without exhaustion, rather than precluding the commencement of the action outright.[7] I therefore

---

[7] Although the heading of subsection (a) of Section 7422 states "[n]o suit prior to filing claim for refund," titles of statutes and headings of sections are only available to "shed light on some ambiguous word or phrase in the statute itself." See Whitman v. Amer. Trucking Ass'ns, 531 U.S. 457, 483, 121 S. Ct. 903 (2001); Almendarez-Torres v. United States, 523 U.S. 224, 234, 118 S. Ct. 1219 (1998); Cenzon-DeCarlo v. Mount Sinai Hosp., 626 F.3d 695, 697 (2d Cir. 2010). However, the IRS relies on the phrase maintained to support its position, and does not contend that the use of "filing" in the title sheds light on an ambiguous word or phrase. To the contrary, I find that maintained is

reject the contention that purely by filing its refund claim first, the Trustee was barred from asserting a claim in the Bankruptcy Court and could not later cure the jurisdictional defect. See Black v. Sec'y of Health & Human Servs., 93 F.3d 781, 790 (Fed. Cir. 1996) (distinguishing statutes that expressly bar filing suit before exhaustion with those that preclude judicial review, and noting that amendment is allowed in the latter). Several courts throughout the country have permitted such or similar amendments. See United States v. Klohn, No. 3:06-cv-222-J, 2009 U.S. Dist. LEXIS 20486, at *4 n.5 (M.D. Fla. Mar. 3, 2009); Whittington v. United States, 380 F. Supp. 2d 806, 813 (S.D. Tex. 2005) (allowing plaintiff to amend complaint despite filing of suit without first exhausting administrative remedies by allowing six-month waiting period under 26 U.S.C. § 6532 to expire); Provenzano v. United States, 123 F. Supp. 2d 554, 558 (S.D. Cal. Aug. 30, 2000); Tobin v. Troutman, No. 3:98CV-663-H, 2002 U.S. Dist. LEXIS 7105, at *17-20 (W.D. Kent. Apr. 19, 2002) (explaining why amendment should be allowed even though Section 6532 bars filing of suit).

Further, the rather compelling facts of this case provide strong support for the conclusion that the Trustee should be considered to have cured the jurisdictional defect here. The IRS had undoubtedly elected to spend both time and resources to evaluate and litigate PT-1's tax liability, having filed two requests for administrative expenses for the Short Period by the time the Trustee filed its counterclaim, and one request just three days after. Thus, the United States had already elected to commit litigation resources to this case, and the argument that the filing of a refund request could have saved it time and money is not particularly persuasive. See Kearns, 177 F.3d at 711; Michaud v. United States, 206 B.R. 1, 8 (D.N.H. 1997). This is especially true in light of the fact that the Trustee filed its refund request less than six months after it filed its claim in the

---

clear, and has a meaning that is distinct from filing. In any event, I find that an amendment is proper based on the facts of this case and the reasoning of the district court cases, both noted below.

Bankruptcy Court, did not move for summary judgment until September 2007 (two years later), and the Bankruptcy Court did not decide the dispute until March 31, 2009. Had the IRS wanted to avoid the costs of litigation and issue the refund, it had plenty of time to do so. It did not, and the record is clear why: since 2004, the Government in this case, and the IRS in its dealings with the Trustee, have taken the position that the absence of a Stub Period return from the Star Group precludes PT-1 from any refund, whether it be from 1998 or the 2001 Short Period. The filing of a refund request fell on deaf ears as a result.

Finally, I note that although the Trustee filed its refund request in September 2005, the Court cannot find any evidence that the IRS challenged the Bankruptcy Court's jurisdiction based on exhaustion of remedies until the Trustee moved for summary judgment in September 2007. Had the IRS objected earlier, the Trustee could easily have amended its claim. I therefore will not penalize the Trustee for not filing until September 2007 the refund request it submitted to the IRS in September 2005.

### 2) Section 106(b)

The Bankruptcy Court held in the alternative that the IRS waived sovereign immunity regarding the Trustee's claims for tax refunds under Section 106(b) by filing a claim against the Trustee for unpaid taxes and penalties from the Short Period. Section 106(b) provides that "[a] governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." 11 U.S.C. § 106(b). The Government challenges this conclusion by: 1) noting that Section 106(b) is limited to claims that are property of the estate, and repeating its argument that the bankruptcy estate here necessarily ceased to exist upon plan confirmation; 2) contending that

27

the Trustee's refund claims are not counterclaims because they did not arise from the same

transaction or occurrence as the IRS's claim for Short Period penalties; 3) asserting that the

Trustee's claims are not counterclaims because the IRS's claims were rejected as untimely; and

4) contending that because Section 106(b) is limited to counterclaims to proofs of claim, the

IRS's filing of administrative claims cannot amount to a waiver of sovereign immunity.  I

address each of these arguments in turn below, except the first, which I have already rejected.

### a.  Same transaction or occurrence

As noted above, Section 106(b) waives sovereign immunity only for counterclaims that

arise out of the same transaction or occurrence as the Government's claims.  This language

mirrors that of Federal Rule of Civil Procedure 13(a), which defines compulsory counterclaims

in ordinary civil litigation.  Accordingly, numerous courts considering the scope of the waiver of

sovereign immunity under Section 106(b) have relied on compulsory counterclaim jurisprudence

under Rule 13.  See, e.g., Gordon, 270 F.3d at 287; In re Univ. Med. Ctr., 973 F.2d 1065, 1086

(3rd Cir. 1992); WJM, Inc. v. Mass. Dep't of Pub. Welfare, 840 F.2d 996, 1005 (1st Cir. 1988);

United States Lines (S.A.) v. United States (In re McLean Indus.), 162 B.R. 410, 417 (S.D.N.Y.

1993); see also Ossen v. Dep't of Soc. Servs. (In re Charter Oak Assocs.), 361 F.3d 760, 768 (2d

Cir. 2004) (noting that most circuits agree that when a state files a proof of claim, it waives

immunity to compulsory counterclaims, referencing Rule 13(a)).  I therefore do so here as well.

The Second Circuit has traditionally taken a "broad view" of the same transaction test

under Rule 13.  See United States v. Aquavella, 615 F.2d 12, 22 (2d Cir. 1979).  To be

considered part of the same transaction or occurrence, the essential facts of each claim need only

have a logical relationship to one another, rather than "an absolute identity of factual

backgrounds."  See Jones v. Ford Motor Credit Co., 358 F.3d 205, 209 (2d Cir. 2004);

28

Aquavella, 615 F.2d at 22. The overarching consideration under this test is whether the goals of judicial economy and fairness dictate that all the issues should be resolved in one lawsuit. See Jones, 359 F.3d at 209; Aquavella, 615 F.2d at 22.

Applying this standard here, I conclude that the Trustee's claim for a Short Period refund is sufficiently related to the IRS's claims to fall under the ambit of 11 U.S.C. § 106(b). Beginning with the IRS's claim for Short Period penalties, those penalties surely were derived in part from the amount of tax allegedly owed by PT-1 (and the Trustee as successor) for that period. Thus, PT-1 had as one available defense to the IRS's claim that it did not in fact owe the underlying tax to begin with, but rather was owed a refund by the IRS. This would necessarily involve, as the Bankruptcy Court held, "the disallowance of NOLs, which is the basis of the IRS's Short Period Request." In re PT-1, 403 B.R. at 262. Accordingly, the Trustee's Short Period claim is logically related to the IRS's request for Short Period penalties, and considerations of judicial economy and fairness support the conclusion that the IRS waived sovereign immunity as to that claim.

Alternatively, I find that the IRS's request for Short Period taxes also provides a basis for Section 106(b) jurisdiction. The IRS does not dispute that this request arises out of the same transaction or occurrence as the Trustee's Short Period refund claim. Rather, the IRS contends that because it filed its request for Short Period taxes three days after the Trustee's claim, the Trustee's claim cannot be considered a "counterclaim." However, by the time the Bankruptcy Court actually resolved both parties' claims, the IRS had indisputably waived sovereign immunity in the Bankruptcy Court for all claims logically related to its request for Short Period taxes. That the Trustee filed its claim three days prior does not eliminate this waiver, and I

29

therefore find that the IRS's request for Short Period taxes provided an additional basis for a waiver of sovereign immunity under Section 106(b).[8]

### b.  Original claims rejected as untimely

Next, the IRS contends that it has not waived sovereign immunity because its claims were rejected by the Bankruptcy Court as untimely.  However, Section 106(b) does not require a decision on the merits of the claim filed by the Governmental unit for the Government to be deemed to have waived sovereign immunity.  Instead, it states that the Government waives such immunity upon the filing of a proof of claim.  See 11 U.S.C. § 106(b).  This is consistent with the fundamental premise of the Bankruptcy Code that once a creditor files a claim against the bankruptcy estate, it triggers the claims process and subjects itself to the bankruptcy court's jurisdiction.  See Langenkamp v. Culp, 498 U.S. 42, 44, 111 S. Ct. 330 (1991).  Thus, Section 106(b) applies even when claims filed by the IRS are dismissed as untimely.

### c.  Application of Section 106(b) to requests for administrative expenses

The IRS next argues that it has not waived sovereign immunity because its claims arose postpetition and are therefore requests for administrative expenses filed pursuant to 11 U.S.C. § 503.  Section 106(b), on the other hand, specifically refers to proofs of claim, which are filed by "creditors" pursuant to 11 U.S.C. § 501.  Creditor, in turn, is defined in 11 U.S.C. § 101(10) as an entity with a claim that arose prepetition, absent exceptions not relevant here.  In light of this clear choice of language by Congress in drafting Section 106(b), I agree with the IRS's contention.

As noted above in the discussion of Section 106(a), the plain meaning of a statute governs unless that statute is ambiguous or would lead to an absurd result.  See Lamie, 540 U.S.

---

[8] This conclusion does not apply to the Trustee's refund claim for 1998, as that claim was derived from NOLs entirely distinct from those related to PT-1's Short Period tax liability.

at 534; In re Ames, 582 F.3d at 427.  Further, Congress is presumed to mean what it says.  See

BedRoc, 541 U.S. at 183, 124 S. Ct. 1587.  In this case, proof of claim is a well-established term

of art under bankruptcy law that is distinguished from an administrative expense.  "Proof of

claim," through both long, historical usage and statutory language, always refers to a debtor's

obligation to a creditor that arose prepetition; "administrative claim" is the term that is used for

postpetition obligations.  Compare 11 U.S.C. § 501 with 11 U.S.C. § 503.  This distinction is

also recognized in the caselaw, as evidenced most recently by the Second Circuit's detailed

discussion of the distinction between prepetition proofs of claim and postpetition administrative

expenses under the Bankruptcy Code.  See generally In re Ames, 582 F.3d 422.  Accordingly, I

find that under the plain meaning of Section 106(b), the Government waives sovereign immunity

only with regard to prepetition proofs of claim.[9]

I also find that this reading of the statute does not lead to an absurd result.  As an initial

matter, the Government's sovereign immunity for claims asserted against it may still be waived

under Section 106(a), which provides a waiver under 60 Bankruptcy Code sections.  Thus, my

interpretation of Section 106(b) will only limit the ability of a Bankruptcy Court to hear

counterclaims that do not fall under those Sections of the Bankruptcy Code.  See 2 Collier on

Bankruptcy § 106.05 (16th ed. 2009) (noting that Section 106(b) is significant because it allows

nonbankruptcy law causes of action to be asserted against the Government).  Second, the Trustee

---

[9] The language "files a proof of claim" was added to Section 106(b) by the Bankruptcy Reform Act of 1994.  Both caselaw and commentators have noted that this language was intended to clarify that counterclaims against the Government were only permitted in cases in which the Government actually filed a proof of claim.  See generally AER-Aerotron, Inc. v. Tex. Dept. of Transp., 104 F.3d 677 (4th Cir. 1997); see also 2 Collier on Bankruptcy § 106.LH (16th ed. 2009); Katrina A. Kelly, Comment: In the Aftermath of Seminole: Waiver of Sovereign Immunity under Section 106(b) of the Bankruptcy Code, 15 Bank. Dev. J. 151, 169 (1999).  Nevertheless, if Congress only wanted to solve this confusion and not otherwise clarify the scope of Section 106(b), it could have simply added the word "filed" to that subsection.  Instead, it also added "a proof of claim," which language I am compelled to give meaning to for the reasons noted above and below.  See AER-Aerotron, 104 F.3d at 680 (noting that the new Section 106(b) "injects three new related requirements," including proof of claim, which the court recognized is a specifically defined concept).

has not pointed to any evidence or argument that supports the conclusion that Congress could not have intended to distinguish between prepetition and postpetition claims, and the Court is not aware of any.  Instead, the Court finds persuasive that in 2005, Congress added a provision to Section 503 that exempts the Government from filing a request for an administrative tax expense in order for its claim to be allowed under that Section.  See 11 U.S.C. § 503(b)(1)(D).  Thus, the Government is now entitled to a priority administrative expense without filing a request, and Section 106(b) need not play any role in administrative tax claims ever again.  Accordingly, I find that the IRS's request for administrative expenses in this case did not waive its sovereign immunity under Section 106(b).

**III.    Acceptance of the 2001 Stub Period Return**

The IRS's next point of contention is that the Bankruptcy Court lacked jurisdiction to compel it to accept PT-1's standalone 2001 Stub Period tax return.  In any event, the IRS contends that the Bankruptcy Court incorrectly held that it acted in an arbitrary or capricious manner in refusing to accept the return.  Before addressing the law and facts as to this point, I briefly discuss the Internal Revenue Code provisions and Treasury Regulations regarding consolidated income tax returns, which are at the heart of this dispute.

A default presumption in the Internal Revenue Code is that a tax return will report the tax liability of a single taxpayer.  One exception to this presumption is that a group of related businesses may, in certain circumstances, file a single consolidated income tax return that collectively reports the income tax liabilities of all the businesses.  See 26 U.S.C. § 1501.  Such returns are filed in the name of the "common parent," which acts as the agent on behalf of the group's subsidiaries in all matters related to the group's tax liability.  See 26 C.F.R. § 1.1502-77(a).

32

Once a group files a consolidated return, it must continue to file as a group unless the IRS grants permission for it to deconsolidate.  See In re Prudential Lines, Inc., 928 F.2d 565, 569 (2d Cir. 1991).  In the consolidated return, the group computes its liability for all of its members as a whole.  Individual members do not calculate NOLs, but instead net any income and losses into a single consolidated net operating loss, known in the regulations as a "CNOL," before taking any CNOL carryover deductions.  See 26 C.F.R. § 1.1502-21(a); see also 26 C.F.R. § 1.1502-21(e) (defining consolidated net operating loss as "excess of deductions over gross income" for the group).  If a corporation ceases to be a member of a consolidated group during a given year, "net operating loss carryovers attributable to the corporation are first carried to the consolidated return for that year."  26 C.F.R. § 1.1502-21(b)(2)(ii)(A).  A departing member may then claim on its own later-filed returns NOLs allocable to it while it was in the group, but only in "the amount so attributable that is not absorbed by the group in that [last group return] year."  Id.

The dispute with regard to the 2001 Stub return centers around the Trustee's effort to carry forward to the Short Period PT-1's NOLs properly allocated to it from the Star Group's 2000 return.  The IRS has objected on the ground that because Star never filed a return for the Stub Period, it does not know whether any or all of the NOL carryover would be absorbed by profits of other Star entities during that period.  The Trustee's response is that the Star Group filed for bankruptcy shortly after PT-1 did, has been liquidated, and neither the Trustee nor any member of PT-1 has access to the Star Group's records.  The Trustee therefore has taken the position before the Bankruptcy Court and before this Court that the IRS should have accepted its individual return, and should be compelled to do so.

Both the parties and the Bankruptcy Court have cited Treasury Regulation § 1.1502-77A(d) as governing this issue.  That regulation provides:

33

If the common parent corporation contemplates dissolution, or is about to be dissolved, or if for any other reason its existence is about to terminate, it shall forthwith notify the Commissioner of such fact and designate, subject to the approval of the Commissioner, another member to act as agent in its place to the same extent and subject to the same conditions and limitations as are applicable to the common parent. If the notice thus required is not given by the common parent, or the designation is not approved by the Commissioner, the remaining members may, subject to the approval of the Commissioner, designate another member to act as such agent, and notice of such designation shall be given to the Commissioner. Until a notice in writing designating a new agent has been approved by the Commissioner, any notice of deficiency or other communication mailed to the common parent shall be considered as having been properly mailed to the agent of the group; or, if the Commissioner has reason to believe that the existence of the common parent has terminated, he may, if he deems it advisable, deal directly with any member in respect of its liability.

26 C.F.R. § 1.1502-77A(d) (emphasis added).

The IRS contends that the Trustee should have sought to represent as agent the entire Star Group and file a Stub return for that period, as the first highlighted portion of the regulation allows. It concedes that this may have been a difficult endeavor, but nonetheless argues that it was the Trustee's responsibility to undertake this task if it wished to carryover the NOLs and obtain a refund. Moreover, the IRS contends that the Bankruptcy Court improperly relied on the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, in compelling it to accept the deconsolidated tax return because: 1) that part of the regulation that gives the IRS the authority to treat PT-1 independently (the second portion of the regulation highlighted above) also gives the IRS unreviewable discretion in deciding whether to do so; and 2) the Bankruptcy Court is prohibited from forcing the IRS to accept the return by the Tax Anti-Injunction Act, 26 U.S.C. § 7421. I address these jurisdictional arguments first, and then address the merits of the dispute.

### 1) Review under the Administrative Procedures Act

The Administrative Procedures Act's (the "APA") comprehensive provisions for judicial review of "agency actions" are contained in 5 U.S.C. §§ 701-706. Any person "adversely affected or aggrieved" by agency action, see id. at § 702, including a "failure to act," is entitled

34

to "judicial review thereof," as long as the action is a "final agency action for which there is no other adequate remedy in a court," see id. at § 704. The standards to be applied on review are set forth in Section 706. But before a party can have judicial review, it must first clear the hurdle of Section 701(a). See Heckler v. Chaney, 470 U.S. 821, 828, 105 S. Ct. 1649 (1985); see also Webster v. Doe, 486 U.S. 592, 599-600, 108 S. Ct. 2047 (1988). That Section provides that the chapter on judicial review "applies, according to the provisions thereof, except to the extent that – (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. §701(a). "These exceptions are construed narrowly and apply only if there is clear and convincing evidence of legislative intention to preclude review." Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009). The Government contends that each of these exceptions apply here and independently preclude the Bankruptcy Court's order requiring the IRS to accept the Stub Period return in this case.

### a. Committed to agency discretion by law

The APA embodies a "'basic presumption of judicial review.'" Lunney v. United States, 319 F.3d 550, 558 (2d Cir. 2003) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 140, 87 S. Ct. 1507 (1967)). However, this presumption is overcome and a reviewing court is without jurisdiction if the statute said to govern the challenged agency action "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler, 470 U.S. at 830, 105 S. Ct. 1649. Thus "§ 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based," Webster, 486 U.S. at 600, and requires dismissal when there is "no law to apply," Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S. Ct. 814 (1971).

35

The law highlighted by the Trustee and discussed by the Bankruptcy Court is the Treasury Regulation quoted above.  This provision states that "if the Commissioner has reason to believe that the existence of the common parent has terminated, he may, if he deems it advisable, deal directly with any member in respect of its liability."  26 C.F.R. § 1.1502-77A(d).  Notably absent from this regulation is any mention about how the Commissioner should reach this determination or what he should consider.  It therefore appears at first blush that the IRS has the better argument here, and its determination not to consider PT-1's Stub Period tax return is a non-reviewable exercise of agency discretion.

This argument is further supported by several cases cited by the IRS that have held agency action to be unreviewable since the Supreme Court's decision in Heckler.  For example, in Webster, the Supreme Court held that the Section 102(c) of the National Security Act provided the Director of the NSA unreviewable discretion to terminate an employee when it stated merely that the Director can terminate the employee whenever he "shall deem such termination necessary or advisable in the interests of the United States."  486 U.S. at 600.  Although the Supreme Court based this decision in part on the structure and nature of the NSA, it first and foremost relied on the fact that the statute shows deference to the Director and does not state that termination is appropriate when the dismissal "is" necessary, but rather when "the Director deems it necessary."  See id.  Other decisions cited by the IRS have reached the same result based on similarly deferential statutes.  See Conyers, 558 F.3d at 144-46 (holding that Section 111(d) under the Aviation and Transportation Security Act, which empowers the Administrator of the FAA to employ and fix the terms and conditions of employment for such number of "screeners" as he determines to be necessary, provides unreviewable discretion to the Administrator); Schneider v. Feinberg, 345 F.3d 135, 149 (2d Cir. 2003) (no jurisdiction to

36

review special master's calculation of payouts from 9/11 victim compensation fund because Sections 404 and 405 of Air Transportation and Safety and System Stabilization Act of 2001 expressly allowed Attorney General and Special Master to adopt all regulations necessary to resolve claims).

Based on this precedent, I agree with the IRS that Treasury Regulation § 1.1502-77A(d) is drawn so broadly as to give absolute judgment to the Commissioner of the IRS as to whether to accept a deconsolidated return from a taxpayer in PT-1's position. Nevertheless, I do not agree that this necessarily removes the IRS's determination from judicial review. As noted by the Trustee, the Treasury Regulation relied on by the IRS is just that, a regulation enacted by the Secretary of the Treasury. I find this fact to be fatal to the IRS's position for two interrelated reasons.

First, the Supreme Court's decision in Heckler describes the agency discretion exception to judicial review as applying to Congressional statutes drawn so broadly that they "can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." Heckler, 470 U.S. at 830, 105 S. Ct. 1649. Thus, the Supreme Court was clearly concerned with Congressional intent, albeit in a less direct fashion than Congress was when in enacted Section 701(a)(1) of the APA. See id. However, in this case, Congress has not given the IRS unreviewable discretion in determining whether to accept deconsolidated tax returns – the IRS has given itself that discretion. This raises the serious question of whether an agency can insulate its decisions from judicial review by its own regulations. In light of the "strong presumption that Congress intends judicial review of administrative actions," Conyers, 558 F.3d at 143 (internal quotation marks omitted), and the fact that the Supreme Court in Heckler considered this presumption to be rebutted only when a congressional statute was drawn so

broadly as to suggest Congressional intent to give absolute discretion to an agency, I conclude

that Section 1.1502-77A(d) cannot give this absolute discretion to the IRS.

Second, there is a Congressional statute that provides the law to which the arbitrary and

capricious standard set forth in Section 706 of the APA can be applied.  Section 1.102-77A(d)

was enacted by the IRS pursuant to 26 U.S.C. § 1502, which provides as follows:

> The Secretary shall prescribe such regulations as he may deem necessary in order
> that the tax liability of any affiliated group of corporations making a consolidated
> return and of each corporation in the group, both during and after the period of
> affiliation, may be returned, determined, computed, assessed, collected, and
> adjusted, in such manner as clearly to reflect the income-tax liability and the
> various factors necessary for the determination of such liability, and in order to
> prevent avoidance of such tax liability.

In this statute, Congress did not give blanket discretion to the IRS, but rather directed that

the Commissioner had to adopt regulations as he deems necessary to insure that the tax liability

of an affiliated group of corporations may be determined in a matter that clearly reflects the

income tax liability and prevents avoidance of such liability.  In other words, the

Commissioner's assigned function under Section 1502 is to accurately assess the tax liability of

affiliated corporations and prevent corporations from avoiding such liability.  I therefore

conclude that this is not "one of those rare instances where statutes are drawn in such broad

terms that in a given case there is no law to apply."  See Volpe, 401 U.S. at 410, 91 S. Ct. 814;

see also Christianson v. Hauptman, 991 F.2d 59, 62-63 (2d Cir. 1993) (looking to the purpose of

related statutes in concluding that Congress "sought to limit the scope of the Service's

authority"); M&T Mortg. Corp. v. White, No. 04-CV-4775, 2006 U.S. Dist. LEXIS 1903, at *33

(E.D.N.Y. Jan. 9, 2006) (holding that the "affirmatively to further the policies of this title"

provision of 42 U.S.C. §3608(e)(5) provided a sufficient standard by which to review the

Department of Housing and Urban Development's conduct).

### b.  Tax Anti-Injunction Act

In the alternative, the IRS contends that there is no jurisdiction under § 701(a)(1) of the

APA because the Tax Anti-Injunction Act prohibited the Bankruptcy Court from requiring the

IRS to accept a deconsolidated return for the Stub Period.  The Tax Anti-Injunction Act provides

that "no suit for the purpose of restraining the assessment or collection of any tax shall be

maintained in any court by any person, whether or not such person is the person against whom

such tax was assessed."  26 U.S.C. § 7421(a).  The purpose of this statute is to protect the

Government's need "to assess and collect taxes alleged to be due without judicial intervention,

and to require that the legal right to the disputed sums be determined in a suit for refund."

Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 7, 82 S. Ct. 1125 (1962); Randell v.

United States, 64 F.3d 101, 106 (2d Cir. 1995).

The Bankruptcy Court held that the Anti-Injunction Act does not apply here because

directing the IRS to accept PT-1's tax return for the Stub Period does not impact the

Government's ability to collect taxes.  I agree.  Both the language of the statute and the caselaw

interpreting it are clear that the Act governs proceedings in which a party is attempting to prevent

the IRS from collecting a tax.  This includes the Second Circuit's decision in S.E.C. v. Credit

Bancorp, Ltd., 297 F.3d 127 (2d Cir. 2002), on which the IRS relies for the proposition that the

Second Circuit has emphasized substance over form when interpreting the Act.  Even in Credit

Bancorp, the IRS was attempting to collect a tax and the debtor was attempting to prevent it from

doing so by obtaining an order establishing that other claims had priority over the IRS's tax

claim.  See id. at 137-38.  In this case, on the other hand, the Trustee sought a refund, which is

exactly what the Tax Anti-Injunction Act requires.  To accomplish this, it simply sought an order

compelling the IRS to accept its deconsolidated tax return for the Stub Period.  The IRS was free

to disagree with the Trustee's reporting, and it was free to argue that it had not acted arbitrarily or capriciously in denying PT-1's request to file on its own. This does not amount to a suit that restrains the assessment or collection of any tax.

The IRS's principal counterargument is that it does not know what a consolidated return from the Star Group would look like, and for that reason the order requiring it to accept the Stub return very well may have prevented it from offsetting any loss claimed by PT-1 with Star Group profits from that period. However, as I discuss in greater detail below, the IRS has no factual basis for this assertion. Instead, the IRS simply believes that it is the Trustee's obligation to represent the Star Group as a whole and to first investigate Star's finances before the IRS must make a determination. But that is not required by the Tax Anti-Injunction Act. Accordingly, I conclude, as the Bankruptcy Court did, that the Tax Anti-Injunction Act did not prohibit the Bankruptcy Court from compelling the IRS to accept the deconsolidated Stub Period return.

### c. Arbitrary and capricious agency action

In Decision III, the Bankruptcy Court held that the IRS acted in an arbitrary and capricious manner in refusing to accept PT-1's deconsolidated Stub return. The court concluded that the IRS's argument that there was a "possibility" that other members of the Star Group owed additional tax "appears to be makeweight," and that it "is inescapable that the IRS's refusal to deal directly with the PT-1 Group, and its refusal to accept the PT-1 Group's stand-alone tax return for the Stub Period, is arbitrary and capricious." In support, the Bankruptcy Court cited the following facts: 1) the IRS withdrew its claim against the Star Group for Stub Period taxes in the Star Group bankruptcy; 2) the Trustee's counsel stated without contradiction or objection from the IRS that he had conversations with two members of the IRS district counsel who stated that STAR did not have any tax liability during the Stub Period; 3) the Star Group has since been

40

liquidated pursuant to its plan of reorganization; 4) the IRS accepted PT-1's postpetition deconsolidated tax returns, while at the same time stating that it did not have a view as to when, if ever, PT-1 ceased being a member of the Star Group; and 5) the IRS did not dispute that PT-1 was not in a position to be designated as agent for the Star Group or to file a return on its behalf.

None of these factual findings are disputed by the IRS, and none are clearly erroneous.[10] I therefore accept them as true.  Considering these findings, in addition to the fact that the Star Group lost millions of dollars in 2000 (some of which was allocable to PT-1) and filed for bankruptcy in 2001, and that the Stub Period only covered January and February of 2001, there is substantial evidence to support the conclusion that the remaining Star entities lost money during the Stub Period.  The IRS responds that it simply does not bear the burden of determining whether the Star Group had profits, but I do not accept that when faced with the evidence noted above, the IRS can refuse to accept a deconsolidated return because of the remote possibility that some or all of PT-1's losses would be absorbed by the Star Group.  Moreover, even PT-1 had the burden of making such a demonstration, the undisputed facts set forth above are certainly sufficient to constitute a *prima facie* case that the Star Group had no profits during this period, and it the IRS offered nothing in rebuttal.  The IRS's refusal to accept a standalone return cannot be said to serve the purpose of accurately assessing PT-1's tax liability or preventing the avoidance of such liability.  See 26 U.S.C. § 1502.  I therefore agree with the Bankruptcy Court that the IRS acted in an arbitrary and capricious manner in refusing to accept PT-1's deconsolidated tax return.[11]

---

[10] The IRS has noted on appeal that the Trustee could have subpoenaed the Star Group's accountants, but at the same time it has also acknowledged the difficulty the Trustee would have in compiling the finances of the Star Group, in which PT-1 was only a small part.

[11] Although the Bankruptcy Court did not rely on Section 1502 in reaching its conclusion, it is clear from its analysis that its decision was motivated by the accurate assessment of PT-1's tax liability.

## IV.     Evaluation of the Pre-Paid Business's Sale to IDT

With the IRS having been compelled to accept the Stub Period return, PT-1's tax treatment of the sale of its pre-paid phone card business to IDT in February 2001 became critical to the Trustee's entitlement to a refund for the Short Period.  Based on the testimony of Rosalind Gaffney and PT-1's general ledger, which were introduced into evidence during a three day hearing in July and August 2009, the Bankruptcy Court held in Decision IV that PT-1 had transferred in the sale its account receivables and inventory (worth approximately $22 million), as well as the obligation to service calls placed under outstanding calling cards.  In return, PT-1 received $1 in consideration from IDT, but also recognized $27 million in deferred revenue that had not been deemed income because PT-1 had not yet serviced the calls for which the $27 million was paid.  In other words, although PT-1 received only $1 in the sale, it kept the revenue for certain outstanding calling cards.  IDT, on the other hand, assumed the obligation of servicing those outstanding cards, and obtained the right to accounts receivable and inventory.  According to Gaffney and the general ledger, PT-1 therefore incurred a net gain of approximately $6 million in this deal.  However, after deducting approximately $12 million in uncollectible bad debts, PT-1 suffered a net loss of almost $6 million for the Stub Period.

The IRS accepts on appeal each of these calculations except for the purported $1 price for the pre-paid business.  In support, it relies solely on the sale agreement between PT-1 and IDT, an adversary complaint filed by PT-1 against IDT in its own bankruptcy proceeding, and a settlement agreement between PT-1 and IDT for approximately $14 million.  However, these documents were not offered into evidence at trial, despite the fact that the sale and the adversary proceeding between PT-1 and IDT was known to the IRS at that time, as evidenced by the colloquy between the IRS's counsel and the Bankruptcy Court during the hearing.  See In re PT-

42

1, 447 B.R. at 133-34.  Instead, the IRS moved to reopen the evidentiary record so that the

Bankruptcy Court could take judicial notice of these documents over one year after the

evidentiary hearing had concluded, and over four months after oral argument was complete and

the record was closed.

As best can be determined from Decision IV, the Bankruptcy Court denied this motion.

The IRS therefore contends on appeal that this was an abuse of discretion.  Additionally, the IRS

contends that once these documents are considered part of the record, the Bankruptcy Court's

conclusion that PT-1 sold the business for $1 is clearly erroneous.

An application to reopen the record is committed to the sound discretion of the trial

judge.  See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331-32, 91 S. Ct. 795

(1971); Matthew Bender & Co., Inc. v. West Publ'g Co., 158 F.3d 674, 679 (2d Cir. 1998);

Romeo v. Sherry, 308 F. Supp. 2d 128, 138-39 (S.D.N.Y. 2004).  Although the Second Circuit

has not articulated a test for evaluating the exercise of this discretion, it has noted that "[o]nly

reasonable genuine surprise on the part of the appellant combined with an assertion of the nature

of the additional evidence would give us sufficient reason to remand for the taking of additional

evidence."  Air Et Chaleur, S.A. v. Janeway, 757 F.2d 489, 495 (2d Cir. 1985).  Further, the

Circuit has cited positively to the Fifth Circuit's decision in Garcia v. Woman's Hosp., 97 F.3d

810 (5th Cir. 1996), in which that court considered: 1) the importance and probative value of the

evidence; 2) the reason for the moving party's failure to introduce the evidence earlier; and 3) the

possibility of prejudice to the non-moving party."  Id. at 814.  I will therefore apply this standard

here.

Beginning first with the probative value of the evidence, the question of PT-1's tax

liability begins with its classification as a taxpayer.  PT-1 reported income on an accrual basis,

which means that it was required to report income when: 1) all the events have occurred which fix the right to receive the income; and 2) the amount of the income could be determined with reasonable accuracy. See 26 C.F.R. § 1.446-1(c)(1)(ii)(A). Under the terms of the contract, IDT was required to place $4 million into escrow, which was to be paid to PT-1 upon closing of the sale as a deposit for future "termination services" that PT-1 was to perform for IDT.

Although neither party has offered any authority or analysis regarding how this Court should interpret this fact,[12] the terms of the agreement appear to place this case on all fours with Schlude v. Comm'r of Internal Revenue, 372 U.S. 128, 83 S. Ct. 601 (1963). In Schlude, the Supreme Court upheld the Commissioner's determination that contract installments that were a prepayment for future services should be included in gross income in the tax year they became due and payable, whether or not they were actually paid. See id. at 134, 136-37 ("For an accrual basis taxpayer, it is the right to receive and not the actual receipt that determines the inclusion in the amount in gross income." (internal quotation marks omitted) (emphasis in original)). Here, the sale agreement calls for that payment to made during the Stub Period. Thus, under Schlude, the $4 million payment should have been recorded as income during the Stub Period.[13]

However, as noted above, the probative value of the evidence is but one factor in the analysis, and the remaining factors are fatal to the IRS's position. Most importantly, the IRS has utterly failed to justify its failure to introduce these documents during the evidentiary hearing. The IRS contends on appeal that it neglected to do so because the Trustee first construed the sale

---

[12] The IRS simply states that it must be recognized during the Stub Period, while the Trustee emphasizes that the payment was for future services and was never received.

[13] The IRS also offers the blanket assertion that some portion of the 2004 settlement must be booked as income during the Stub Period, but I do not accept this contention. The IRS offers no legal support for the conclusion that a portion of the 2004 settlement, which notably was a global resolution of all claims in the adversary complaint, in fact accrued in the 2001 Stub Period under principles of tax accounting. It further has offered no evidence as to what amount of the settlement is properly booked in the Stub Period. I therefore agree with the Bankruptcy Court that the adversary complaint and the settlement agreement are not probative on this issue.

44

as a loss in its second post-trial brief filed in May 2010 (the IRS filed its motion to reopen two months later). However, I cannot accept that the IRS was unaware of the Trustee's position on the proper tax treatment of the sale until that late in these proceedings. As the Bankruptcy Court found, and as is confirmed by the transcript of the evidentiary hearing, Gaffney unequivocally testified that PT-1 reported a $5.8 million taxable gain on the sale by subtracting the accounts receivable sold to IDT from the deferred revenue PT-1 retained and realized. In other words, because PT-1 had approximately $27 million in deferred revenue, the sale, when distinguished from the realization of this deferred revenue as income, clearly was represented as a loss. This arithmetic is also unambiguously expressed in the Trustee's first brief, filed shortly after the evidentiary hearing and before oral argument. Thus, the Trustee's treatment of the sale was clear. Moreover, the amount PT-1 received from IDT in consideration would always have been relevant to PT-1's tax liability, and the IRS offers no explanation for why it would not have contested the allegedly inaccurate $1 sale price in any event. The IRS has therefore failed to offer any justification for its failure to offer these documents into evidence during the hearing, and this factor precludes me from concluding that the Bankruptcy Court abused its discretion in refusing to reopen the record.

Finally, as to prejudice, the Trustee does not specifically address this prong on appeal, but argued to the Bankruptcy Court that he would be prejudiced by not being able to "examine the drafters of the documents or examine the former officers and directors of PT-1 who were involved in the litigation." Although those involved in the litigation would not be relevant as I have already discounted the probative value of the settlement documents, the Trustee is correct that he faces at least some degree of disadvantage by being surprised with this document over a

year after the evidentiary hearing closed and by not having the opportunity to submit evidence with regard to the terms of the contract, which is undoubtedly complex.

In sum, the IRS was well aware at the time of the evidentiary hearing that the Trustee was relying on the $1 sale price in calculating the tax owed for the Stub Period.  Further, it should have been clear that the Trustee was including the deferred revenue in determining that the net effect of the sale was an approximately $6 million gain, and that when this gain was combined with a deduction for bad debts, the result was an approximately $6 million loss.  Nevertheless, the IRS neglected to raise any issue or assert any argument with regard to other consideration PT-1 may have received as a result of the sale at that time.  Rather, it awoke to these issues over a year after the evidentiary hearing, and over four months after oral argument on the evidence had concluded.  This extreme example of both delay and a lack of justification establishes that the Bankruptcy Court did not abuse its discretion in denying the IRS's motion to reopen the record.  Accordingly, these documents are not a part of the record before me, and without them, the Bankruptcy Court's factual findings regarding the sale are not clearly erroneous.

## V.    Remaining Contentions Regarding Tax Liability

The parties challenge four additional rulings of the Bankruptcy Court with regard to the Trustee's tax liability for the relevant periods.  They are: 1) the allowance of certain bad-debt deductions for the Stub Period, the Short Period, and the 2002 tax year; 2) the disallowance of a bad-debt deduction for the 2003 tax year; 3) the discharging of the Trustee from any liability for the 2002 tax year as a result of the IRS's failure to comply with the timing requirements of 11 U.S.C. § 505(b); and 4) the barring of claims filed by the IRS for the 2001 Short Period due to the IRS's failure to meet the administrative bar date.  I find these challenges to be without merit,

46

and affirm the decision of the Bankruptcy Court as to these issues based on that Court's well-reasoned analysis.

## VI.    Recoupment and Setoff

Having concluded that the Bankruptcy Court correctly calculated the Trustee's tax overpayments in this case, the final dispute at issue in this appeal is whether the Bankruptcy Court had jurisdiction to enjoin the IRS from the future exercise of any right to setoff or recoupment against the Trustee. "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." Citizens Bank v. Strumpf, 516 U.S. 16, 18, 116 S. Ct. 286 (1995) (internal quotation marks omitted). Setoff is a longstanding common law defense that provides a defendant with the right not to part with one's funds. See id. at 21; In re Chateaugay Corp., 94 F.3d 772, 777-79 (2d Cir. 1996). It is also granted to the Federal Government by several statutes, including 26 U.S.C. § 6402, which provides that when a taxpayer has made an overpayment, the Secretary of the Treasury may, within the "applicable period of limitations," credit that overpayment against any tax "liability" owed to the IRS by that taxpayer. See 26 U.S.C. § 6402(a).

Recoupment, on the other hand, involves a special subset of setoff that applies in cases in which the factual basis for the claim and the setoff defense are related. See Reiter v. Cooper, 507 U.S. 258, 264, 113 S. Ct. 1213 (1993). The benefit of recoupment over setoff is that recoupment rights survive even if the defending party could not bring an affirmative claim due to the expiration of the applicable statute of limitations. This is true, however, only if the original suit, to which the recoupment is lodged as a defense, is timely. See id.; Davidovich v. Welton (In re Davidovich), 901 F.2d 1533, 1537 (10th Cir. 2001).

47

The Bankruptcy Court held that because the IRS failed to object to the provision of the plan barring the exercise of setoff and recoupment rights prior to confirmation, it is barred from objecting after the fact according to principles of *res judicata*. The Court further noted that the IRS was of the position that it was "somehow exempt" from this plan provision, but that it had failed to cite any authority for its argument. See In re PT-1, 430 B.R. at 273. However, the authority is the now familiar ground of sovereign immunity. As previously discussed, the sovereign immunity of the United States may only be waived by statute, see Presidential Gardens, 517 F.3d at 611, and must be "unequivocally expressed." Diaz v. United States, 517 F.3d 608, 611 (2d Cir. 2008); see also United States v. U.S. Fid. & Guar. Co., 309 U.S. 506, 513-14, 60 S. Ct. 653 (1940) (holding that sovereign immunity may not be waived by the inadvertence of government officials, and there is no *res judicata* when jurisdiction is based on such a waiver). Sovereign immunity protects the right to setoff and recoupment, see Malman v. United States, 207 F.2d 897, 898 (2d Cir. 1953) (requiring sovereign immunity waiver to include setoff rights, and noting general policy under predecessor to 31 U.S.C. § 3728 that "claims against the United States are always subject to set-off"), and setoff similarly may only be abrogated if "there is some explicit statutory or contractual provision that bars its exercise." Applied Cos. v. United States, 144 F.3d 1470, 1476 (Fed. Cir. 1998). The question, therefore, is under what statute has the IRS waived sovereign immunity such that it can be enjoined from exercising its rights to setoff and recoupment?

Neither the Bankruptcy Court nor the Trustee has cited any. The IRS has volunteered 11 U.S.C. § 1141(a), but unsurprisingly promptly distinguishes that statute from the instant action. Section 1141 is one of the provisions for which sovereign immunity is waived under 11 U.S.C. § 106(a), and subsection (a) of that statute provides that certain parties are bound by the

48

provisions of a confirmed plan. However, the only potentially applicable class of parties set forth in subsection (a) that the IRS could fit in is that of a creditor. As discussed above, a creditor is defined in 11 U.S.C. § 101(10) as a holder of a prepetition claim. Accordingly, Section 1141 does not provide the explicit waiver of sovereign immunity that the Trustee needs.

The Trustee nevertheless contends, as the Bankruptcy Court did, that caselaw establishes the *res judicata* effect of confirmed plans. However, the majority of these cases do not involve the Government as a party, and therefore are not instructive on the issue of sovereign immunity. See, e.g., Silverman v. Tracar, S.A. (In re Am. Preferred Prescription), 255 F.3d 87, 92 (2d Cir. 2001); Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp., No. 02 Civ. 9629, 2003 U.S. Dist. LEXIS 9802 (S.D.N.Y. June 11, 2003). For those cases that do involve the Government, one is distinguishable on its facts, and the second offers only dicta.

Beginning first with the latter of these two cases, both the Bankruptcy Court and the Trustee have relied on In re Bousa Inc., No. 89-B-13380, 2006 Bankr. LEXIS 2733 (Bankr. S.D.N.Y. Sep. 29, 2006), for its holding that because the plan did not expressly prohibit the future exercise of rights to setoff or recoupment, the Government could not be barred from asserting these rights. See id. at 21-22. However, it would not be proper for me to draw from this holding that the Bousa court would have enjoined the Government's rights had the plan so provided. The court was not faced with those facts, did not enjoin the Government's right to setoff or recoupment, and did not discuss sovereign immunity. I therefore find that decision to be of limited value here.

Second, the Trustee cites to United States v. Cont'l Airlines (In re Cont'l Airlines), 134 F.3d 536 (3d Cir. 1998), in which the Third Circuit held that the Government was bound by a confirmed plan. However, this case is distinguishable on its facts. First, the Continental

49

decision made no mention of sovereign immunity, and it therefore does not appear to have been raised as a defense by the Government. Second, the Government was a prepetition creditor in that case, and therefore had waived sovereign immunity under Section 1141(a). Third, a district court had held the Government liable for the sum it wished to setoff approximately eight months prior to plan confirmation, yet the Government failed to assert its right to setoff in the bankruptcy in the interim. See id. at 537-38. Here, by contrast, no claim was asserted against the IRS until after plan confirmation. Accordingly, I find that these decisions do not support the conclusions that the Bankruptcy Court had jurisdiction to enjoin the IRS's rights to setoff and recoupment in the plan as a result of the IRS's failure to object.

That is not to say, however, that the IRS is free to exercise its rights to setoff or recoupment against each of the potential liabilities of the Trustee it identifies in its papers. Specifically, the IRS notes that it will seek approximately $140,000 in unpaid taxes that the Trustee allegedly owes from 2002, notwithstanding the fact that the Bankruptcy Court, and now this Court, has held that the Trustee was discharged from this liability pursuant to the procedures set forth in 11 U.S.C. § 505(b)(2). The Trustee argued below that there is no right to setoff as a result of this discharge, which argument the Bankruptcy Court elected not to address in light of its conclusion that *res judicata* was sufficient to expunge the IRS's rights. Because I do not agree with the Bankruptcy Court on this issue, I address the implication of Section 505(b) with regard to the IRS's setoff rights here.

Section 505(b)(2) provides that when a request for a determination of unpaid tax liability incurred during the administration of the case is submitted to the IRS and the Government does not provide notification of any tax due within 180 days, the estate, the trustee, the debtor, and any successor to the debtor are discharged from any liability for such tax. See 11 U.S.C. §

50

505(b)(2). Notwithstanding this discharge from liability, the IRS contends that its defensive right of setoff remains viable, as the Trustee's liability must be distinguished from the IRS's affirmative defenses. In support of this argument, the IRS relies on the "vast majority of courts" to conclude that a defendant's right to setoff is unaffected by discharge. The IRS is correct that the majority of courts have reached this conclusion, see Luongo, 259 F.3d at 333 (citing cases), but those decisions all address setoff under 11 U.S.C. § 533, which is explicitly limited to the setoff of prepetition claims, see id. Moreover, the IRS has not identified a single case, and this Court has found none, that has held the right of setoff to survive a discharge of liability based on the narrow interpretation of that term advocated by the IRS. Instead, those decisions primarily rely on that portion of Section 553 that states "this title does not affect any right of a creditor to offset a mutual debt," which courts have interpreted to mean that no provision of the Bankruptcy Code abrogates a right to setoff mutual prepetition obligations. See Luongo, 259 F.3d at 333; Davidovich, 901 F.2d at 1539; see also Carolvo Television Inc. v. Nat'l Broad. Co., (In re De Laurentiis Entertainment Group, Inc.), 963 F.2d 1269, 1276 (9th Cir. 1992) (relying on the language of Section 553 in addition to various policy and historical considerations). Thus, the breadth of cases holding that the setoff of prepetition debts trumps the discharge provisions found in other sections of the Bankruptcy Code are not particularly helpful to the IRS's position.

Moreover, the problem with the IRS's restrictive interpretation of the term "liability" is highlighted when one considers both the natural meaning of that term and its use in the relevant statutes. As noted above, when the IRS fails to assess additional tax beyond that paid pursuant to a tax return filed along with a request for determination of any unpaid liability, the estate and others are "discharged from any liability from such [unpaid] tax." See 11 U.S.C. § 505(b)(2). This discharge of liability, as the IRS would have it, means only that the IRS cannot

51

affirmatively seek recovery from that taxpayer. Its right to setoff, according to the IRS, is untouched. However, the IRS's statutory right to setoff is set forth in Section 6402(a) of the Internal Revenue Code, which states that the Secretary of the Treasury may credit the amount of a tax overpayment "against any liability" of the taxpayer. The Sections use the exact same term – liability. Thus, when a party is liable to the IRS for taxes owed, the IRS may exercise setoff. However, when the IRS fails to assess tax with the 180-day time limit set forth in Section 505(b)(2) of the Bankruptcy, there is no liability, as it has been discharged.

This is also consistent with the natural meaning of the term liability, and therefore applies equally to any common law right to setoff possessed by the IRS. Liability is defined by Black's Law Dictionary as "[t]he quality or state of being legally obligated or accountable. . . a financial or pecuniary obligation . . . or a debt." Liability is therefore the equivalent of owing another, which is the term used by the Supreme Court when defining the right to setoff. See Strumpf, 516 U.S. at 18, 116 S. Ct. 286 (explaining the setoff allows entities to net monies they "owe each other"). However, when the IRS failed to comply with the procedure set forth in Section 505(b)(2) for the 2002 tax year, PT-1 no longer owed it anything by way of additional taxes. When one is no longer liable to another, it is only natural to conclude that he does not owe that party anything either. And without anything owed to it, the IRS has nothing to setoff against the refund it owes to the Trustee. I therefore conclude that the IRS has no right to setoff for the 2002 tax period.[14]

---

[14] In the alternative, the Trustee argued before the Bankruptcy Court, and again here, that the IRS may not assert a right to taxes for 2002 because that right has expired with the statute of limitations. Specifically, 26 U.S.C. § 6402 provides that the IRS has the right to offset an overpayment with a tax liability "within the applicable period of limitations." See 26 U.S.C. § 6402(a). The IRS responds that this restriction does not apply to its right to recoupment, which is correct. See Reiter, 507 U.S. at 264, 113 S. Ct. 1213. However, the IRS has not asserted a right to recoupment for the 2002 tax year, and regarding its right to setoff, it simply notes that it has either timely assessed or timely claimed in the Bankruptcy Court all taxes owed. I do not agree, as I conclude that the timing requirement set forth in Section 505(b) of the Bankruptcy Code qualifies as an applicable period of limitations under Section 6402 of the Internal Revenue Code. Thus, this also eliminates any right to setoff for the 2002 tax year.

## CONCLUSION

For the foregoing reasons, the final order of the Bankruptcy Court is hereby affirmed in part and reversed in part.  That part of the order enjoining the IRS from exercising any future right to setoff or recoupment is vacated.

**SO ORDERED.**

s/Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
September 17, 2012

53